Thank you, Your Honor. May it please the Court. Wayne N. Hage here, pro se. I didn't quite hear the pronunciation of the name. Hage. Hage, okay. Yeah, think of sage and just put an H on it. Hage like sage, okay. Yes, yes. We'd like to split our time between Mr. Pollitt and myself and leave three minutes remaining for rebuttal as well. So if we could split our time six minutes apiece and three minutes remain, so there we go, yeah. Are you for the estate or for the individual? The individual, Your Honor. The main thing I want to address today is, first of all, the lower court on remand had used tax evidence of the amount of livestock that I had paid taxes on as the amount of cattle that were actually alleged to be grazing and for what I was charged damages for. That is completely wrong and has no bearing whatsoever. Help me on something here. Why or how can the defendant avoid willfulness in the face of the agency telling the defendant, you can't do this? Because there was a longstanding dispute, Your Honor, of how a person with cattle can access the water rights, the stock water rights. The only physical way to be able to do that would be to take the cattle to the water, locate them on the water and allow them to drink. I thought you were allowed to build a ditch from the water to the ranch. That's the decision in Hunter out of this court and also the decision now out of this court. However, the government has refused to allow us to do that as well. The only way we could possibly... Is that part in the record that the government refused to allow you to transport the water? No, that is not, Your Honor. That was after the decision in this court. I asked the government three times if they would allow me to transport that water off the land through the 1866 laws directed by this court and all three times they said absolutely not, except they might allow us to take one or two water rights off out of the 130 if it was a very short little distance. But that's post the previous decision. Let me say it this way. This case came up to us once before. We sent it back down again and you're saying that your requests and the government's refusal took place after we sent the case back down? That is correct, Your Honor. So the agency, although it's not in the record, the agency refused to allow transportation of the water to the cattle? That is correct. They did it three times. But that's not in the record before us? No, it's not, Your Honor. Okay. So proceeding with the tax, the taxes in absolutely no way reflect how many cattle that were on the ranch or anywhere on those allotments or on the water rights. I had cattle in six different areas in the state of Nevada at any given time. I had three ranches leased in Smoky Valley, in the northern end of Monitor Valley, let alone the amount of patented ground that we hold ourselves. For example, the lower court had decided to, saying that there were 600 head of cattle in Monitor Valley. But they refused to acknowledge that our patented ground, over 7,000 acres of land is in Monitor Valley. So, I mean, the cattle are on patented land. They're on ranches all over the state of Nevada, Fallon and the sale yards and the feedlots in Fallon. So they absolutely in no way reflect or have any indication of what cattle were even alleged in the complaint. Mr. Hage, what about the cattle that you were managing and grazing for other ranchers? Was there any accounting for those head of cattle in computing damages? Yes, those cattle were also included. And the government had explicitly several times stated to the court that they absolutely were not seeking damages on those cattle. The reason is because they were going after those ranchers through the administrative process and had actually already exacted money out of several of them. So they were not coming after me for those cattle. And those cattle were also cattle that I were paying taxes on. So the head tax that you owe to the state of Nevada depends on how many cattle you're managing as opposed to how many cattle you actually own and brand? I took control of the cattle to try to protect those people. And in the process, I went ahead and paid the cattle tax on it. It was a lot easier. Even though they still actually own those cattle? Correct. So there's such a massive discrepancy there. Even in the one example, well, you know, in the First Amendment complaint, they brought 50 allegations. Out of those 50 allegations, they only actually presented evidence for 17 of those. And so in those 17 allegations, why they did not present evidence to the other remaining ones, there's lots of reasons for some. One instance in specific, the cattle were actually on patented ground. And the government finally recognized that and decided, well, they better not, you know, bring that I read your deposition and it looked to me like it was difficult to remember at any given time exactly how many head of cattle were being grazed where. Yes, that is correct. And I take it you didn't have detailed records that would have given us with mathematical certainty how many cattle were being grazed in what locations? No, the cattle were placed on the water rights. But no, there wasn't. I mean, by that time in trial, of course, my head was pretty much, I mean, dealing with having to represent myself and trying to remember every little detail. I totally understand that. I just, I guess where my question is going is, how could the from discovery, your answers to interrogatories, your testimony on deposition, the testimony of the wranglers who worked with you and moving the cattle? What more could the district court do in trying to be precise? Well, the district court originally, you know, the first time the district court, I think was quite precise. They simply, they took the allegations of the cattle. Was that $168.53 damages award? Is that? Yes, that was, the reason it was the $168 is because the trial court had only found instances of trespass on two occasions. However, when this court had stripped off the half a mile limitation, then that took it over to the entire 17 that were actually proven. So that $163 or whatever it was, that was for cattle that were not only taken to the water, but straight outside the half mile limit. Yes. Yes. See, and furthermore, in the Back up to something for me. Oh, yeah. What you said before that it's not in the record, but the agency refused three times to let me transfer the water to the cattle. That strikes me as really important. How come it's not in the testimony or anywhere in the record? Because the trial was already over. Well, I mean, going into the trial, I would have thought that would come up. Well, yes, but it happened after trial. It happened after remand, the trial and remand. But it happened during the time you were back in front of the district court? No. The only, when we were in front of the district court, the government And just to be clear, when you were back in front of the district court the second time. Right. Oh, okay. And so when you were back in front of the court, the district court the second time, when were the requests and the refusals made in relation to the time you were back in front of the district court the second time? Right after that. Right after that. After the district court the second time rendered its decision? Yes, because the United States had refused to grant me a permit to allow access to have the cattle physically go to the water. Right. So I asked them, if you're going to refuse that access in that manner, then can we transport the water to the patented ground? Okay, but to be clear on the timing, and I'm not sure in the end whether it's going to make much difference to us, but just to be clear, or at least as clear as you can be, the requests and the refusals sound as though they were all made after the district court the second time around rendered its judgment? That is to say, well, this case was on appeal to us the second time, is that right? Yes. Okay. There would be one exception, and that was early on in the original trial court during the discussions with the United States where in trying to resolve the dispute, the question, of course, is how do we resolve this dispute? If you're not going to let me take cattle to that water, then how do I get that water out of there? They said, well, maybe you can walk in there with a five-gallon bucket and put the water in the bucket and then drive 60 miles home and then water your cow. Now, in the trial when I asked, it was on depositions and it came out in the trial, and actually it did come out in the deposition when I asked the government how would I be able to use this water without having to go get a permit? In other words, if I can't take the cow to the water, then how am I going to be able to use this water without this permit? And especially if they decide to revoke the permit for some reason. And that was the testimony of Stephen Williams when he said, well, you can take a helicopter, you could fly your cow over the water and then drop her in as long as her feet don't touch the ground and she can drink the water and you fly her out. Well, then that's fine. And maybe a two or three mile long straw. These all sound the same. No, I don't think you'd allow the straw, would you? Well, it sounds to me as though this is off the point of the current case in front of us, but it sounds to me as though you may have a fairly good lawsuit for an injunction on this point. That's a different question. And I may be misunderstanding some of the details of it, but it sounds to me as though this is a separate claim and it may be a pretty good one. So the government has just consistently refused your potential claim of right to dig a ditch or use another device such as a pipe from your water rights to your ranch. Yes. Yes. Mr. Hage, I'll ask Ms. Peterson the same question. It strikes me that maybe this might be a case if both sides are willing to sit down and talk with one another where mediation might be of assistance. Would you be willing to consider doing that to see if this case could get worked out? Yes, I'm always willing to sit down and talk. Don't we have some clear law that says that your water right includes an implied easement to use a ditch or other device to get the water to your ranch? Yes, that is correct. I mean, this was litigated during the Federal Court of Claims in Hage v. United States. I think it also came up in the earlier Circuit Court decision remanded, didn't it? Yes. That law was mentioned. I mean, it was not at issue, but that basic proposition was described in our earlier decision. Yes, and that was the solution in the Hunter case, which the decision is based on. And for the Hunters in Death Valley, you know, in fact, they still own that water, and if the Hunters in Death Valley want to be able to use that water, they have to transport it out of Death Valley. And that's all 26 sources and the entire flow of those 26 sources, according to this Court's opinion in the Hunter case. Would it kill the cattle if you can't dig your ditch? Yeah. I'm sorry, I didn't hear the question. Oh, I asked if it would kill the cattle if he could not dig a ditch to run the water down to the ranch. Well, in one of the other— I've been in Konopah. I didn't happen to see any grass. I think there was a little decorative grass in front of a motel or something, and that was it. Yes, Your Honor. Well, and one of the things I think that complicates the government is most of the water rights are actually inside wilderness areas. I mean, for them to allow and mechanize equipment in there in order to put the necessary pipelines and the roads and whatnot, they're going to absolutely refuse to allow that water to be transported. Yet they're also going to refuse— The law has commands to them as well as to you. You're not allowed to graze your cattle without a permit. They're not allowed to deny you the ability to take water from your water rights to your ranch. I realize that's the law, but if I go and try to do that, then I'm facing another prosecution. The last time I tried to use the water rights in a decent manner, I got prosecuted for it. Well, that's why I asked about whether or not there was any possibility that you guys might be able to sit down and talk to one another and see if this can't be worked out. I'm always willing to do that, Your Honor. Although that sounds like a separate lawsuit from the one you've got in front of us now. Well, you can certainly mediate current, future, and pending suits. I'm wondering about that, too, and try and wrap it all up. I'm wondering about that, too. It sounds like your lack of rights is now clearly established by circuit authority to graze your cattle on the federal land without a permit. But it looks as though even though we have cases that say that you have a right and the government has a commensurate duty to allow you to take the water by a ditch or other means from their water rights to your ranch, it looks as though you've run up against a brick wall there. Yes, Your Honor. Well, to complicate matters further is, of course, we had a no doubt on the ranch, and now we're going through foreclosure because we're losing the property. I imagine you can't make money on it if you have no water. I doubt they'll be willing to even sit down and talk. They'll just wait until I get my head chopped off, and then it'll be done. And they won't have to worry about me. We'll talk to Ms. Peterson about that. Thanks, Your Honor. You wanted to split some time. You've used up all of your 15 minutes, but what I'd like to do is pretend that you used up six, and we'll go back to where we were. So if you would put nine minutes on the clock. So you used a constructive six minutes instead of 15. Thank you, Your Honor. Thank you. May it please the Court, my name is Mark Pollitt. I am the attorney for the estate of E. Wayne Hage. And, by the way, I wish everyone in this courtroom good luck because today is Friday the 13th. It actually falls. And for those of you who may have been a Pogo fan way back when, you know, the debate always was, what date does Friday the 13th fall on this time? So I had, as usual, an argument outlined. And, as usual, it's going to end up going in a different direction. There are basically three issues that this Court asked to be resolved on remand, one of which is which body of law applies. Is it the state law? Is it federal law? Well, our conclusion and our argument is there is no federal law. Ever since Mason put an end to it. Before we get there, is there any judgment that runs against the estate? No, Your Honor, but the estate's interests are still affected by this because the value of the estate's assets are directly affected by what rule is applied in terms of deciding whether there is a trespass in the first instance and what the penalty for that trespass is. Okay. That's all I needed to know, and it may well be that the estate doesn't have standing, but I'm interested in the argument you were trying to pursue. Okay. Mason followed an attempt by the Supreme Court to follow a doctrine of federal common law. And by the time they got to Mason, you know, Erie Railroad versus Tompkins and all these cases went by the wayside. Mason was a case that specifically addressed this particular kind of action. Now, in Mason it was minerals. Here it's trespass to vegetation effectively. But as the Supreme Court said, you look at the character of the action, as in Mason, and in this case the character of the action was a dispute about title to land, who owned rut, what right there was to access that land, and, frankly, the remedy that they were asking for and the remedy they were asking for was an injunction to prohibit continuing trespass. If one reads the complaint, it is full of references to trespass. The only time the regulations are actually cited as proof that he did not have permission to go on the land because, in their view, his right to go on the land was tied up with these permitting processes. But doesn't the trespass establish the violation of the regulation? Well, the problem with the violation of the regulations, Your Honor, is that there is, first of all, the agencies, of course, have no legislative authority. They cannot decide that this is a civil or a criminal action. You're answering a different question. I want to focus solely on whether or not it makes a difference whether we characterize it legally as a trespass, where the judgment is based on administrative penalties imposed for breach of the regulation, and isn't the breach established by the trespass? Actually, Your Honor, no, because the regulatory provisions that they rely on don't even try to establish a penalty. They are simply guidelines for an authorized officer to settle a claim of trespass. Well, I forget what the title is, but isn't it essentially unauthorized grazing? Unauthorized grazing, Your Honor, we submit based on the regulations and everything else is where you actually have a permit, you've accepted a permit, and you are taking actions that are inconsistent with the terms and conditions of the permit. The regulations also address grazing without a permit. Your Honor, I would have to disagree with that because what they do say in a companion regulation is a person, and that's the regulation that refers to itself as penalties, and those penalties are to shorten the term of the permit and reduce the numbers of the permit, refuse to grant a new permit, et cetera. And it then says if the person is not willing to settle on those terms, then the government has to refer this to an appropriate person for legal action. Counsel, let me refer you to 43 CFR section 4140.1B, which deals with the BLM regulations, and it basically says that persons performing the following prohibited acts are subject to civil and criminal penalties, and subsection 1 says allowing livestock or other privately owned or controlled animals to be driven, to graze on or be driven across those lines without a permit or lease. That establishes the lack of permission, according to the government.  It establishes the violation, does it not? And it's commit that the act is either trespassing on federal land without a permit or allowing cattle to graze on federal land without a permit. I would respectfully disagree. The penalty sections themselves specifically say you can take this to a magistrate and charge them with a violation of the regulation for which the penalty would be $500 or X number of months in jail. And the problem here, Your Honor, is that the BLM itself in its own regulation says that Mason provides the measure of damages for trespass. You have to follow Mason. That's BLM's own regulation. So even they accepted that premise. If I may, Your Honor, if you don't have any further questions in this area, can I briefly say the question was raised here about whether or not this trespass, why is it not, you know, willful trespass exposing Mr. Hage if you apply the federal law to this willful repeated rate? And the reason is, and the trial court previously found this, I think quite correctly, is there were two lawsuits going on at the time. One was in the U.S. Court of Federal Claims. The other one here in the Nevada. The U.S. Court of Federal Claims action started more than 25 years ago. I was there. It was my birthday. So I remember it very well. And the trial court in that case found that Mr. Hage had the right, the authority, to bring his livestock onto the land in order to access and use the water and that the grazing was simply incidental to that. That was one of the theories that we applied in the trespass case. That case was decided by the trial court. It went up to the U.S. Court of Appeals for the Federal Circuit, where the government argued that Mr. Hage needed further permission, special permission to get to his water right. The Fed Circuit said, we think that argument goes too far. Of course he has a right to access and use that water right. And the Hages were relying on that decision. I mean, there is even Supreme Court precedent that essentially says that you accept the government's word for something at your own peril. And so they had a – and plus they've done their own research. Mr. Hage Sr., you know, who is now deceased, wrote a book called Storm Over Rangelands. And so he did extensive research into all of these questions. So they were certainly acting in sincere and genuine belief that they had the right. They had two courts at least. How did they phrase it exactly? How did they phrase the right exactly? I'm trying to get at this distinction between the right to taking the water to the ranch and the right to take the cattle to the water. That was something that was not direct. I mean, up until this point, frankly, Your Honor, and in this particular case in our earlier appellate brief, do we sit here and say, look, nobody has ever defined exactly what that right is or where it comes from. That I'm not sure of. I mean, we say in our previous case in Hage where we remanded, we say in Hunter v. United States, we held that pursuant to the Mining Act of 1866 and another act, an owner of water rights possessed the right over federal lands for purpose of diverting the water by the construction of ditches and canals. And then we say on the next page, in sum an owner of water rights has special privileges when applying for a grazing permit and has a right to access the federal lands for the sole purpose of diverting the water. But he may only graze the cattle on the lands if he's obtained a grazing permit. And it looks like what we're saying is you can dig a ditch from the water to the Hage Ranch, but you can't graze the cattle on the federal land. You're correct, Your Honor. At that point, that was decided. But the meaning of Hunter was not at all settled at that point. And part of our argument in front of the Court was that in the Hunter case, the case was remanded back in Hunter to give Hunter an opportunity to plead an access easement. At that time, the Hunter court said, look, he has not pled that. Maybe there is an easement back there. And so they remanded it back and said, you know, to give him an opportunity to amend his complaint to allege an easement, which was not done because at that point the Hunters simply essentially threw up their hands and said, we just can't take this anymore. I'm not terribly interested in the detail of the Hunter case, but I am interested in the holding of the Hunter case as just recited by Judge Kleinfeld. And if we go back to the question of willfulness, well, Hunter's decided in 1967, and it, as I read it, establishes the right to get the water from the source. But it also says you can't graze your cattle there without a permit, which brings me back then to the question of, well, given Hunter, why was it not an obvious wrong for the Hages to bring their clients onto the land to do grazing as they were at the water? Because Hunter seems to clearly say they can't do it. Well, Your Honor, I would disagree that that Hunter – I understand they might not like Hunter. I disagree that the Hunter case actually – I mean, that was the whole fight in front of the – Right. You know, in front of the court. It seems to me that that fight's finished. The court of claims itself, however, Your Honor – and I'm sorry, I didn't mean to run over you – but the court of claims itself specifically looked at Hunter and concluded there was a difference between getting a grazing permit for the purposes of grazing and the incidental use of forage while you're using the water right. And the government, as I say, in the claims court case and in front of the Fed Circuit, argued that you could not access that water, you know, without some further permission of the government. And the claims court and the Fed Circuit questioned that whole thing. So the Hages rightly or wrongly, at least in good faith, looked at those cases, looked at the decisions that had been rendered in their favor and the other research they did and essentially said, you know, based on what the Fed Circuit had to say and based on what the U.S. Court of Federal Claims had to say, we are, we do have the right. And the scope of Hunter, given that the court itself said, well, he never alleged a right-of-way, and Hunter was decided on the basis of the fact that no right-of-way was alleged, so it couldn't possibly have reached the question as to what that right-of-way existed at all and what the legal and physical scope of that right-of-way would be. But even if there is a right-of-way, that is to say a right of passage of cattle to and from the source of the water, and that's indulging, I think, everything I can in favor of your client and Mr. Hage, that doesn't include the right simply to graze the cattle on the surrounding lands. Well, this is where the trial court, of course, had decided that, in fact, as long as you were within X amount of distance of your water right, based on the, part of our argument below, Your Honor, was that Congress can be held to know all of the facts pertinent to its regulations. And one of the things they know is that if you put livestock on water, you could put one cow hand out there for every head of cattle, and you cannot keep that livestock from dipping its head down and biting on grass. And so Congress, in our view, had to have had that in mind and had recognized. By analogy, Your Honor, it would be like saying I'm going to give you an easement for a dirt road over my property, but you need special permission to kick up dust when you're driving on that road. It can't happen. It's just physically not possible, and you cannot bring livestock to the water. But you're not really addressing my point. Okay. If you haven't, and this is indulging the assumption as best I can to the maximum extent in favor of your client as to a right of way to access the water, an easement for the cattle to get there, not merely an easement to get the water out. Understood. Counsel? I understand. The cattle on their way to the water, when they're at the water and on their way back, will eat grass. I get that. But what happened in this case was much more than that. That is to say the cattle were grazing in the area surrounding the water. They were not simply using some easement to get to and from the water and eating along the way. Or around the water source, because you can't take them to the water source without them eating around the water source. The trial court, based on the evidence on the normal, natural behavior of livestock, determined that that easement included boundaries within a half a mile. If it was a linear source of water like a creek or stream, it would be 50 miles either side of the banks, the furthest extent of the water. If it was something like a pond or a well, then it would be a radius of half a mile around that water source. And as long as they didn't stray outside of that, then they were within the physical and legal bounds of the easement. The court did find that there was trespass when that livestock wandered away from that water source more than half a mile. Mr. Pollack, same question I asked Mr. Hage. Would this case, I mean, this litigation has been going on now for decades. Is there any way we can get the parties to sit down with an able judge or a mediator to see if this can be resolved rather than litigated? Because it just seems to me that you're spending an ungodly amount of time and money, and I'm not sure it's advancing either side. I've been on this case so long, your Honor, might as well be a probate attorney. Well, I hope not. Me too, but I understand. Your point is, and I would agree with that. I've done this before in other cases, and most of them were grazing cases. They involve water rights. And as we all know, water rights are central. People have died over water rights. We get that in the West. We understand. This is really important. When I was in front of him once before, the chief judge in the panel said exactly that. Don't people shoot each other over water? I would love to see this do that. If the government is willing, I certainly think it is worth the effort to sit down and try to talk with them. Twenty-six years is a long time. Is there something to talk about? The reason that I expressed some inclination similar to Judge Tallman's is it sounded to me as though the government has just refused to recognize a right to dig a ditch from the water to the ranch. And it seems like that's exactly what Hunter and the previous United States v. Hage case held, that they have a right to do. So that would be something to talk about. But I don't know if I'm reading it right. No, that is exactly right, Your Honor. The problem is it's got to be one way. This court, I think, itself said, look, it's got to be one way or the other. We think it has to be this way. And, of course, we're bound by that. The agency is not the judges. We are. The agency doesn't get to just judge. We get to do that. We each have our assignments. And the problem, Your Honor, with the whole thing is if they simply refuse to do it, then the ranch or, you know, the estate or whoever it is is back in court again saying, now that you've denied us this right, now we have another Fifth Amendment takings claim, and there's no question as to its ripeness. And so I would agree that it is certainly worthwhile for the parties to sit down and see if they can figure it out. And if they can't figure it out, well, then people need to decide where they're going to go next. Okay. Why don't we hear from the government? And we've taken you over time, too, but we'll make sure you have a chance to respond. Okay. May it please the Court. Elizabeth Ann Peterson for the United States. I'd like to address the issues that are actually in this case, but first I think it might be useful to clarify the question about whether there has been a request for a ditch and whether there's a right to make a ditch. Would the government let them dig a ditch from their water rights to their ranch? We're not aware that Mr. H has ever applied. You didn't answer my question. Would the government allow the Hague interests to dig a ditch to get the water from the water rights that they own to the ranch that they own? That's a far more complicated question than I think it's being given credit for. For one thing, the water rights. I'm understanding that to mean no, we do not accept what Hunter and the previous Hague decision held. No, that is not what I'm saying. I shouldn't understand that? May I just explain quickly? The water right itself is a question of state law, and the Mining Act of 1866 granted rights to divert water that mirror state law. So if and only if the state law water right includes the right to use stock water on grazing lands by diverting it to other lands, he might be able to get permission from the state engineer. Didn't we say exactly that in the previous Hague case as well as Hunter? You call it an if, but I thought that's what we held. The court said that the right includes that. It wasn't at issue, and the state would have some say in it. So when you ask me if we're going to refuse, I have to tell you it is not entirely up to the federal government. He would have to have permission from the state to change the place of use of that water. So you're telling us your answer depends in part on the extent or the nature of the state-created water right? Correct, Your Honor. Now, if the state-created water right includes the right to divert the place of use from, I don't know what it would be, close to the source of the water, so if the state-created right includes the right to transport it from the source of the water to their ranch, and I do not know how far that is, if that state-created right includes that right, would the government oppose? There again, the government has to regulate the lands for multiple uses. So whether Hague can go out with a shovel and dig a ditch to move water from one point to another in order to use a right he claims in the water isn't entirely the authorization, the authority for the United States to allow that. Well, don't you have to, if you're not going to allow it, don't you have to condemn the water rights and pay the damages for the water and also for all the dead cows? Your Honor, there's nothing to do with dead cows here. Well, if they don't drink water, they're going to die. That may be correct, but the right to use the water depends on the right to use the land. So I do not believe we would be liable for any dead cattle if Mr. Hague were denied permission to dig a ditch across these lands. The reason I got the idea about the ditch is that I read a state of Hague where it says in Hunter v. United States, we held that pursuant to the Mining Act of 1866 and another act, an owner of water rights possessed a right of way over federal lands for the purpose of diverting the water by the construction of ditches and canals. So I understood that to mean that the Hagues have the right to divert the water by the construction of ditches and canals. What am I missing there? That's a reasonable reading of this Court's decision, but those issues were not in front of this Court at that time. The question was whether Hague was trespassing on federal lands. I'm not sure whether you understand what we're trying to – we know it wasn't before the Court at that time. We know that it hasn't been adjudicated. We've read the record and the decisions. I think what we're exploring is, is there any point to a mediation or is the government just going to say no or stall until everybody, including the cattle, are dead, or is the government going to work something out in accord with what we held the Hagues have a right to? The United States is always willing to talk if there is the potential for a mediated outcome, which would be vastly preferable here to the incessant litigation by the – So who needs to be at the table besides the government, the estate, and Mr. Hague? I heard you say there might be some third party, like State Water Rights Authority or something, that might need to – Yes, it would seem like the best outcome would at least require the Hagues to have permission from the state engineer to move the place of use. We don't understand that there's any deficiency in the amount of water available to use the forage on their private land. So it's not entirely clear that they could make beneficial use of additional water piped in from federal land on their private pastures, and the state engineer would take that into account in determining whether a change of use could be granted. And that would be, of course – They have a property right to divert that water to their ranch, don't they? The right in the 1866 Act mirrors their right under state law. What I'm describing is what that underlying right is, and that underlying right is defined by Nevada. In Nevada, stock water and forage are intimately connected, and in this case, the private pasture lands where the water would be taken are not deficient in water. So what it would do would be to potentially destroy the value of the forage on the federal lands without benefiting the private pasture lands. This is a question for the state. Well, we're not in a position to judge that, but I can certainly understand the point. You're saying that one of the factors here is what is the nature and extent of the state water right. Correct, Your Honor. And depending on the nature and extent of the state water right, the Hages may or may not be able to transport it from the source of the water to the ranch. And I have no idea what the answer to that question is, but that question is an important question as to whether or not they would have the right to do that of what the federal government would or would not allow them to do. Correct, Your Honor. And the United States would not be in a position to grant a FLIPMA easement over the lands to take the water in order to do so. But what I'm really doing is trying to circle back to the question, who needs to be at the table if we're going to get a negotiation? It sounds as though we need to have someone representing the state water engineer. I don't know whether it's Mr. Turnipseed or not anymore. Probably not. I think it's not Mr. Turnipseed any longer. I just couldn't resist it. It's such a nice name. At a minimum, Your Honor, there would need to be at least a clear statement from the state engineer, if not his presence, to determine what the scope is of any right the Hages might have to move water to their private pasture. You understand that there's no issue here of the government deciding whether to grant an easement. What we said in Hage and held in Hunter was they already have an easement. They own it. It's property. I understand that. I may have overstated what the government can do. The United States can surely regulate. I understand. The government's not the judge of this. No, I understand that. This Court is, and this Court has said they have an easement. And that that easement is subject to reasonable regulation. So that would be the application of the FLIPMA requirements to any application they would make to divert the water across the lands. And that would be a matter of how they exercise the right, which is clearly within the United States' authority to regulate. I think one of the practical concerns I have, as Judge Fletcher acknowledged, we have no idea what distances we're talking about here. It may not be feasible or economical for the Hages, even if they had the right to construct a ditch, to do so over the distances that may be involved here. That is certainly a reasonable consideration. I don't have information about that. I think the government lands here are maybe 10% smaller than the state of Rhode Island. So it's a small state. I don't know. I drove through there a month ago, and it didn't look that small to me. No, these are. I was thinking of Alaska. Yeah, I think it's. I'd put it closer to Alaska than Rhode Island based on my drive through. These are all facts, of course, that haven't been developed at all in this record, and I have no information. But Mr. Hage, I'm sure, is well in possession of the facts. He knows the distances involved here. He may be able to answer that. I guess the question, though, is that would it be worthwhile to ask the parties to sit down and try and talk about these issues and see if there's a resolution with help from either a judge or a mediator? Well, Your Honor, we ordinarily are eager to try to work things out with parties that we regulate and others. This is not a case that I think is likely to reach a satisfactory understanding among all the parties simply because it's extremely complicated and because the nature of the problem is that the operation that the Hages would like to conduct really requires the use of lands that they need permission to use, and their unwillingness to seek that permission, which resulted in the withdrawal of permission, has caused that operation to become unviable. There's no good reason to move the water when a responsible rancher could simply apply for a permit and use it the way it was intended and the way the state law... When you say a permit, what permit are you now talking about? A grazing permit. A grazing permit. Yeah. Well, it's quite clear that the federal government does not need to give them a grazing permit. Well, the federal government would need to give them a grazing permit in order for them to conduct the operation that we are talking about in this case... I understand that. ...which was conducted in Tresthaus, and that was what I referred to. These lands can be used. So you're saying you might give them a grazing permit rather than let them dig a ditch. I'm saying that the practical way to use... They own the rights to dig the ditch. We don't know that, Your Honor. I thought we did because we thought it was so conductive. No, we do not know that because we don't know the extent of the water rights. Right. Well, that's true. That's the issue. And, I mean, I'll just ask the question directly. I mean, are the emotions here so raw on both sides after 26 years of litigation that there is no way in this lifetime that BLM and the Forest Service are going to issue any grazing permits to Mr. Hage even if he applied for them now? I can't answer that question. I believe that if Mr. Hage were to apply for permits, and incidentally this court was told this morning that we had denied him a new grazing permit. That's not correct. He did not complete an application for a new grazing permit. I'm sorry. You're speaking too quickly. I didn't understand what you said. I apologize. This morning Mr. Hage stated that the agencies had denied him a permit, would not issue him a grazing permit. No, no, and that's not what he said. Well, excuse me. I understood him to say that, and I wanted to clarify that he has not ever applied for a permit. No, I heard him say they have three times denied him the permission to transport the water from the water source to his ranch. He did say that also. Oh, but you're referring to something else? Yes. Oh, well, I'm not interested in the fact that they've denied him a permit. That's not what I'm interested in. Do you know anything about them, his having requested and a denial of a request to transport the water? I do not. You just don't know one way or the other? I am not aware that he has done that or that it has been denied three times. So that's all in answer to questions that have arisen today. Yeah, there's been an awful lot of talk here about stuff that is nowhere in the record before. Right, and in fact, of course, even the existence of the water rights was never at issue here. There's no judgment from any court that he even owns these rights other than some of them. Let me ask you something about the amount of the penalty which is at issue here. We've done a lot of exploration of the possibility of mediation. What I want to ask is this. Hage obviously grazed his cattle at the water hole or pond or stream or whatever it is on federal land where he had water rights, and he grazed them without a permit. The question is whether he gets the Phase I penalties, Phase II penalties, or Phase III penalties for just doing it or doing it willfully or doing it willfully and repeatedly. He did it repeatedly. It's just a question of whether it was willfully. Now, on the willfully, he obviously had a claim of right, operated under a belief that he had a right. In addition, the first district court decision said he did indeed have a right to do what he did. In those circumstances, can it properly be held that his grazing without a permit but pursuant to a right that he believed in and the district judge had accepted? Can it be properly characterized as willful? He willfully grazed his cattle there, but did he willfully violate the law? Your Honor, the only—as you point out, the district court's first decision in this case held that he did have the right to put his cattle there. That's the only court that did that. He was not—there is no judgment for damages for the period of time while that judgment, while that court's judgment was in effect prior to this. What about before that judgment? He had a belief and he was confirmed to be right by the district court, so why wasn't he, during the period leading up to that judgment, non-willful and just willful after that judgment? He had a belief that was contrary to this court's law, contrary to multiple orders and bills that were presented to him by the agencies that managed the land. It was contrary to the judgment in his own case in the Court of Federal Claims, which did not hold that he was entitled to make incidental use of federal lands for grazing in conjunction with his water rights. That was only ever the judgment of the district court in the now vacated decision in this case. As far as the interpretations of law go, your position is that he should have known from prior Ninth Circuit law in Hunter that he shouldn't have grazed his cattle, and the Court of Claims decision made it clear he shouldn't graze his cattle there. Correct. Is that what you're saying? Yes, correct. He had no good faith reason to believe that the law would allow this. If there are no further questions? Does the willfulness have to include a willful choice to act contrary to law, or is it enough for willfulness that he intentionally chooses to graze his cattle without a permit? The latter, Your Honor. So if he willfully grazes his cattle pursuant to a good faith and justifiable belief that he has a right to do it, it's still willfulness? That would be willful use of federal lands without a permit. Could you tell me the best authority for that? That is how these penalties are applied by the administrative agency whose regulations they're obtaining. Okay. Tell me the agency decision we should cite for that proposition. I cannot do that, Your Honor. I think there might have been a miscommunication between the two of you. As I understood Judge Kleinfeld's question, it is he's willfully grazing the cattle in the sense that he knows darn well where the cattle are, but he has a good faith belief that what he's doing is legal under the law. Is that willful? You said yes. Do you mean to say yes? It might be. It might be. In this case, it clearly was not the case. No. I'm not asking about this case. I'm asking about a hypothesized case, which may or may not be this one, in which case he knows exactly what the cattle are doing, but he has a good faith and justified belief in the sense that he's not just sort of a good faith fantasy land, but good faith based on something. He may be wrong, but it's a good faith belief that he's allowed to do it. Is that willful? I think that was Judge Kleinfeld's question to you. Exactly. Where he's been repeatedly told that he doesn't have the right and he believes it anyway. Don't talk to me about this, what you think the facts are, because you may be right, but stay with the hypothetical. It is possible that willfulness would not have been applied here. This is not the application of the. . . Did you understand my question? I did. May I finish my explanation? Well, if you'd answer the question, because you keep. . . I'm not sure you're answering my question, because the question, I think, is pretty clear. He knows what he's doing with the cattle. He has a good faith belief based on something other than fantasy. He may be wrong, but it's a good faith belief that he's legally allowed to do so. I understand that it's. . . Well, I'll conclude that it's wrong, but is it a willful violation? That's the question. I will answer it in two parts. In this case, the district court applied the administrative penalties as a good approximation of the value of the forage that was used illegally by Mr. H. So in this court. . . You know, I asked you a question that can be answered yes or no. Do you have a yes or do you have a no? From the agency's perspective, which is not what is at issue here, it doesn't matter what he believes if it's not inadvertent, it's willful. If it's not inadvertent. Inadvertent with respect to what? What the law is or what he's doing with his cattle? What he's doing with his cattle. Okay. And, Your Honor, we did not. . . You don't have authority for that. I mean, we don't care. I don't think that some government agency says you can't do that. If somebody's holding up a sign on the sidewalk saying, I protest this or that, and a policeman tells them you can't do that, I'll arrest you for holding up a sign conveying that message, he's willfully holding up the sign, but he's not willfully violating the law. But in this case. . . Do you understand what I just said? I do, Your Honor, but in this. . . Now, just. . . All you have to do is tell us the court decision or the agency published decision or something so that if we go your way, we can cite it. In this case, there is no relevant agency decision to define the terms of their regulatory measures of penalties for unlawful grazing. There may be administrative decisions which have not been cited here, and I would be happy to provide that as supplemental authority. But in this case, what the district court did was to review the trial record and to determine that there was no legal and no reasonable reason why this was not repeated, willful, and unlawful. Yes, so you're saying. . . And fair enough, you're saying, okay, am I hypothetical, or maybe Judge Kleinfeld is hypothetical, as I'm sort of piggybacking on. It just isn't the facts of this case. Correct, Your Honor. So my time has been up for some time, and I would therefore ask that the court affirm the judgment in its entirety. Thank you. Okay, thank you. Well, we've taken everybody over time. Why don't we keep doing it? Why don't we put five minutes on the clock to be divided between the two of you as the two of you choose to do? Thank you, Your Honor. On rebuttal, the first thing I'd like to touch on is Hunter. Hunter had to do with California water law, as distinguished from Nevada water law. So that was the distinction between Hunter and us and what we were trying to do in order to preserve our water rights. Second of all, in 1996, under the Court of Federal Claims, the trial court there had taken up that same question and had discussed Hunter. The question was, leading up to the question, with the creation of the U.S. Forest Service and then subsequently the BLM later on, that's when a person had to start getting a permit. The question then was, prior to that, did Nevada law recognize an appurtenant right to the forage? In other words, was the forage a part of the water right itself? In order to take up the water on land in a desert and make beneficial use of it, then you would have to have cattle that had incidental grazing with it. Otherwise, you couldn't sustain the cattle on that water right. And, for example, a lot of our water rights are for 150 head or 300 head at individual water sources, and there's about 130 different water sources. So, of course, our argument at that time was that, yes, it did in fact include a forage right in that context prior to the creation of the Forest Service and the BLM, and the court was exploring whether the Forest Service or BLM at that point in time could extinguish that or if that was a prior existing right, which they had no authority over. And that discussion was in 1996 when the court posed that question, and then subsequently in 2003, I believe, the court upheld that there is an appurtenant forage right under Nevada law. That's what we were operating under as good faith, that we weren't willful. So the court of claims said there was an appurtenant forage right? Yes, that was in 2000. I can't cite it right now. I'll have to make a supplemental on that. And that's where the court, in fact, I think Judge Jones in the previous trial court's decision, the 100-and-some-odd-page decision, talks about a little bit on that case. So, and in light of the claims court litigation, we were trying to protect our water rights and keep those water rights from being lost. The government had always threatened, well, if you don't use those water rights for five years, then they go away. That's correct under the statutory water rights, the water rights that were vested, which most of them are. Turns out that's not the case. So we were trying to make an honest assertion of those rights so that we did not lose them. And as executor of the estate, I was in the place that I needed to make sure that the property rights of the estate were not lost. And so it was an honest assertion of rights. It was not a willful trespass. Going to a second point, I had asked the state, I had started the paperwork to ask them for a transfer of the use of the water rights from one location to another location. That process actually has started. And just verbally, and of course, this is not the answer of the state engineer, but, yeah, that is not a problem. And as far as can we make use of the... Not a problem, you hope. I hope, yes, you're exactly right, I hope. No, as far as transferring the water to the patented lands, there's 130-some-odd different sources, so it's going to take 130 different right-of-ways, and we're fully capable of putting those right-of-ways in. And what's the distance involved? The farthest possible distance, I think, is about close to... I think the farthest one would be about 90 miles away. Transporting water, 90 miles? Yes, that's correct, sir. And you would anticipate transporting it how? Through a pipe. Through a pipe? Yeah. Is that economically feasible? I mean, I understand it might be physically feasible, but is the water that valuable that you're willing to construct 90 miles of pipe? Yeah. I believe it is. Okay. I mean, I'm not in a position to judge that. I'm just asking you. Oh, it's very valuable. Now, and then in the case that the United States actually might grant a permit in the future, the state engineer was suggesting that to make an alternative, in other words, you know, two different points of beneficial use, one being in the spring source itself, in case that water right was sold to somebody who wanted to go get a permit, or whether that if the permit was not granted, then the water could be transported through the right-of-way and removed. The other thing I wanted to touch on was that the United States had never amended the complaint in the trial courts. In the trial courts, the second on remand, had put in all kinds of damages for the years that never even were in the first amended complaint. It was post-first amended complaint. The only evidence that was allowed in the court, because it was such at a late time, it would have opened up discovery for another two years, the court allowed discussion of that, but for injunction purposes only, because that's what the government was seeking. In other words, the court was asking, is there a problem here? Do we need to get an injunction against Hage for the United States? For that purpose, that discussion took place on that, that time period outside the first amended complaint. And subsequently, on remand, that ended up being 5-6 of the damage award against me. However, that was never, never amended. The government never sought to amend that, or when they did, it was denied, and we had no opportunity to come back and defend ourselves, and thus our prejudice against that. And they come out with astronomically high numbers, which doesn't even match the amount of cattle that were even in existence on the ranch at the time. And that's one of the main problems with that judgment. And lastly... Okay, we've taken everybody over time, and we've given you more time. You're over time again, and this is... In a sense, the question as it comes to us, in the form in which it comes to us, is relatively confined, but it's obviously connected to a much larger and fairly complicated dispute. I'm not speaking for the panel, but obviously we're thinking about the possibility of mediation. Our court has mediators. They work for free, and they're pretty good. This one may be beyond their capacity to settle. I'm wondering if maybe this one might be a better one for a judge mediator. Yeah. I just think maybe we need a little more horsepower on this one. But we're thinking about the possibility of mediation because there are an awful lot of moving pieces, and it may be that it's beyond the capacity of the mediator. Well, and it is, and it's quite an important question that I'd love to see get resolved because in a sense it makes a water right holder of a stock water right. Any rancher that gets denied a permit now all of a sudden has the right to take that water off the land, but if the government's not going to allow it, then we have massive takings. No, I understand. Unfortunately, that's the law that we're dealing with and the hand that we're all dealt. It's not an ideal situation for the government, and it's not an ideal situation for the water right holder. And that's the greatest thing that would come out of this court is if that could all be solved once and for all. Okay. Well, thank all sides for, I'll say, interesting, and you've all tried to be helpful. Yeah. Thank you. Okay, submit it for decision. Okay. All rise.
judges: Kleinfeld, W. Fletcher, Tallman